RANDY S. GROSSMAN
Acting United States Attorney
VALERIE H. CHU
California Bar No. 241709
MICHELLE WASSERMAN
California Bar No. 254686
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:(619) 546-6750

Attorneys for Plaintiff
United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No.  20CR1912-BAS |
| | ) | |
| | ) | |
| v. | ) | **UNITED STATES'** |
| | ) | **SENTENCING MEMORANDUM** |
| BRUCE BAKER, | ) | |
| | ) | Date: June 4, 2021 |
| Defendant. | ) | |
| | ) | |
| | ) | |

**I**

**INTRODUCTION**

Over two decades, La Jolla dentist Bruce Baker gave every outward appearance of being a pillar of the community and a model of success.  But Dr. Baker exploited scam after scam offered by his rabbi, Yisroel Goldstein of the Chabad of Poway, to cheat the IRS and enjoy the fruits of his labor without paying his fair share of taxes.  Dr. Baker and Goldstein conspired to disguise a variety of benefits to Defendant as tax-deductible "gifts to charity."  These ranged from the mundane to the self-indulgent to the mysterious – from private tuition at Defendant's son's private school, to hundreds of thousands of dollars in construction materials, to transfers of undeclared income to Israeli and Swiss foreign bank accounts owned by Baker.  Baker covered his decades-long tax-free spending spree by styling his expenditures as charitable donations, then getting back the benefit of all of his

1  money – minus the 10% fee taken by Goldstein to disguise each transaction as a charitable
2  donation to the Chabad.

3      All told, Dr. Baker reported over $2.6 million in gifts to charity, of which he got
4  back for his own use and benefit approximately $2.4 million.   Year after year, he
5  subscribed false tax returns and cheated the IRS, inflicting $635,829 in intended tax losses.

6      To his credit, Dr. Baker has demonstrated his remorse for participating in this
7  scheme; he even took steps to remedy the wrongs by coming forward with information
8  that assisted the investigation and repaying significant funds to the IRS.

9      Ultimately, while a significant sanction is necessary to effectuate just punishment
10  and deter would-be wrongdoers, the United States submits that the reasonable sentence
11  for this 75-year old retired dentist with no risk of recidivism and a terminal diagnosis of
12  leukemia is a sentence of **15 months.**

13  **II**

14  **STATEMENT OF FACTS**

15      Dr. Baker has known Rabbi Goldstein for nearly 35 years, having met him through
16  a business partner in 1987.  Goldstein offered to help Baker with any financial needs, and
17  in the mid-1990s, Baker took advantage of the offer.  First up: writing off the tuition
18  payments to his son's private school.  Baker made pretend "donations" to Goldstein's
19  charitable organization, and, after charging a 10% fee, Goldstein paid Defendant's son's
20  private school tuition.  This worked the first year, but the following year, the school
21  refused to accept the tuition funds from Goldstein.

22      Undeterred, Baker and Goldstein moved on to other scams.  To hide his money
23  from the IRS and avoid foreign currency controls, Baker used Goldstein's 90/10 scheme
24  to move tens of thousands of dollars to Israeli and Swiss bank accounts.  Similarly, Baker
25  used Goldstein's 90/10 scheme to write off nearly half a million in fees for his son's dental
26  school and post-doctoral residency, nearly three-quarters of a million dollars in building
27  services and supplies, and $200,000 to Baker's son.

28

1     Goldstein apparently did not have a monopoly on creative schemes to cheat the IRS

2   with donations to religious entities; Baker agreed with another San Diego religious leader,

3   "Y.F.," to make a sham donation valued at $1.2 million, in the form of an ancient Iranian

4   Torah, to Y.F.'s charity.  Baker and family members split the tax deduction, each reporting

5   a $400,000 gift, although the Torah did not actually exist and no charitable donation was

6   ever made.

7     After an associate of Goldstein's tipped Baker off in October 2018 about the FBI's

8   search of Goldstein's office and home, Baker did not deduct any of his 2018 purported

9   donations to the Chabad, and filed amended tax returns for years 2010 to 2017.  When

10  contacted by law enforcement directly, Baker, through counsel, took responsibility for his

11  involvement in the crime, indicated his willingness to cooperate, and agreed to a pre-

12  indictment guilty plea in which he acknowledged the full scope of his misconduct.

13                                          **III**

14                          **SENTENCING GUIDELINES**

15     The United States recommends the following Guidelines calculations:

16  1.  Base Offense Level [§2T1.1(a)(1); §2T4.1(D)].......................................... 20

17  2.  Sophisticated Means [§ 2T1.1(b)(2)] …………………………………….+2

18  3.  Acceptance of Responsibility [§3E1.1] ......................................................-3

19  4.  Substantial Assistance [§ 5K1.1]…………………………………………...-3[1]

20              **Total Offense Level          16**

21  At Offense Level 16 and criminal history category I (PSR ¶ 56), Baker's Guidelines range

22  is 21-27 months.

23                                          **IV**

24          **ADDITIONAL SENTENCING FACTORS UNDER § 3553(a)**

25     After calculating the applicable Guidelines, the United States turns to the sentencing

26  factors.  In this case, after considering the § 3553(a) factors, the United States recommends

27

28        [1]      *See* Appendix.

                                            3

1   a downward variance to **15 months** to account for Defendant's history and characteristics,

2   the need for just punishment and to afford general deterrence, and to avoid unwarranted

3   sentencing disparities.

4          There is no question that the conduct underlying this case was serious: it was born

5   of greed, opportunity, and a disregard for the rules that bind our society together.  It is

6   hard to explain why an individual as educated, sophisticated, and (as reported to the court

7   by a well-wisher) "honorable" an individual as Dr. Baker would decide to engage in this

8   scheme – not just once, in one variety, but repeatedly, over years, over many variations.

9   He had to realize that paying his son's private school tuition – then later, the tuition for

10  his son's dental school and post-residency program – were not, and could never have been,

11  tax deductible.   He knew he was paying for expensive home improvements with

12  unreported income, and that he had never donated an ancient Torah to Y.F.'s organization.

13  Baker clearly enjoyed having a reputation in his community as someone respected,

14  honorable, and generous, and it appears that he continued with this scam as it allowed him

15  to live the lifestyle he wanted, while also appearing to be a major donor to the Chabad.

16         Given that motivation, the public exposure of his criminal conduct, his felony

17  conviction, and a custodial sentence should sufficiently promote specific deterrence and

18  protect the public from any further crimes by Baker. In addition, Baker suffers from

19  chronic lymphatic leukemia, and has demonstrated remorse for participating in this

20  scheme.  He will no doubt submit glowing and positive letters from supporters, attesting

21  to his contributions to the community.  He took steps to remedy the wrongs by coming

22  forward with helpful information and immediately acknowledging and starting to repay

23  his debts to the IRS.  All of these personal factors weigh in favor of a sentence below the

24  calculated Guidelines, and support the variance sought here.

25         The need to afford general deterrence to this type of rational, cost-benefit-driven

26  crime is critical, particularly in cases such as this where the public is watching and the

27  outcomes will be well known.  Some degree of punishment is essential.  But it must be

28  balanced by the unique history and characteristics of the defendant before the Court, and

1  in this regard, the United States submits that the custodial time requested for this 75-year-
2  old leukemia patient sends a sufficient deterrent message.

3      The sentences must also avoid unwarranted disparities among other co-defendants.
4  Boris Shkoller, who joined in Goldstein's tax evasion scheme through an intermediary
5  (co-defendant Alexander Avergoon), was sentenced to one year of probation with a fine
6  of $2,000.  Yousef Shemirani was sentenced to two years' probation and a fine of $10,000.
7  Bijan Moossazadeh, who engaged in the fraud for six years and was responsible for tax
8  losses of $91,500, was sentenced to 3 months in custody.  Baker engaged in the scheme
9  for two decades, with two different religious leaders, causing tax losses of $607,829.
10  Baker procured the most benefits, and caused the greatest tax losses, among participants
11  in Goldstein's 90/10 scheme.  A proportionate sanction is therefore warranted for Baker.
12  The United States believes that a sentence of **15 months** would fulfil the purposes of this
13  sentencing factor.

**V**

**RESTITUTION AND FINE**

**A. RESTITUTION**

17      Due to penalties and interest, the $607,829 tax loss has grown to loss of
18  $1,380,628.98 owed to the IRS. Defendant has already paid $805,901.00.
19  The United States requests that the Court issue a restitution order as follows:

   1. Defendant agrees to pay restitution to the Internal Revenue Service in the total
amount of $1,380,628.98, in taxes, penalties and interest, pursuant to 18 U.S.C.
§ 3663(a)(3).  The amount of $805,901.00 shall be credited to Defendant for
amounts already paid to the IRS towards the restitution amount, leaving a
balance of $574,727.98.

   2. Defendant understands and agrees that this figure does not include interest under
26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26.

   3. Defendant agrees that the total amount of restitution reflected below results from
Defendant's fraudulent conduct:

| Tax Year(s) | Amount of Tax | Amount of Penalties | Interest Under Title 26 Due Through 5/21/2021 |
|---|---|---|---|
| 2010 | $12,862.00 | $9,646.50 | $10,325.60 |
| 2011 | $104,919.00 | $78,689.25 | $75,105.04 |
| 2012 | $153,991.00 | $115,493.25 | $99,032.30 |
| 2013 | $69,368.00 | $52,026.00 | $39,704.88 |
| 2014 | $31,364.00 | $23,523.00 | $15,793.69 |
| 2015 | $34,732.00 | $26,049.00 | $15,147.20 |
| 2016 | $125,322.00 | $93,991.50 | $41,693.76 |
| 2017 | $75,271.00 | $56,453.25 | $20,125.76 |
| Total | $607,829.00 | $455,871.75 | $316,928.23 |

4. Defendant agrees that restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States.  If the Court imposes a schedule of payments, Defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

5. The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4).  Defendant does not have the right to challenge the amount of this restitution-based assessment.  See 26 U.S.C. § 6201(a)(4)(C).  Neither the existence of a restitution payment schedule nor Defendant's timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment.  Interest on the restitution-based assessment will accrue under 26 U.S.C. §§ 6601 from the last date prescribed for payment of the tax liability that is the subject of the restitution-based assessment to the date that the IRS receives full payment.

6. If full payment cannot be made immediately, Defendant agrees to make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as

6

appropriate), and to disclose to the IRS any and all additional financial information and financial statements provided to the probation office. Defendant also agrees to provide the above-described information to the probation office.

7. Defendant is entitled to receive credit for restitution paid pursuant to this plea agreement against those assessed civil tax liabilities due and owing for the same periods for which restitution was ordered.  Defendant is not entitled to credit with the IRS for any payment until the payment is received by the IRS. Defendant understands and agrees that this plea agreement does not resolve the Defendant's civil tax liabilities, that the IRS may seek additional taxes, interest, and penalties from Defendant relating to the conduct covered by this plea agreement and for conduct relating to another time period, and that satisfaction of the restitution debt does not settle, satisfy, or compromise Defend-ant's obligation to pay any remaining civil tax liability.  Defendant authorizes release of information to the IRS for purposes of making the civil tax and restitution-based assessments.

8. Defendant shall send restitution payments to the IRS at the following address:
   IRS-RACS
   Attn:  Mail Stop 6261, Restitution
   333 W. Pershing Avenue
   Kansas City, MO 64108

With each payment to the IRS, Defendant shall provide the following information:

    a.    Defendant's name and Social Security number;

    b.    The District Court and the docket number as-signed to the case;

    c.    Tax year(s) or period(s) for which restitution has been ordered;

    d.    A statement that the payment is being submitted pursuant to the District Court's restitution order.

Defendant shall send to the Clerk of the District Court and to the U.S. Attorney's Office Financial Litigation Unit notice of payments sent directly to the IRS.  A

failure to send payments to the IRS at the specific address set forth above, or a failure to include all of the information listed above, may result in a delay in the application of the payment or result in the IRS applying the payment in the best interest of the United States, including application to taxes or periods other than those identified above.

**B. FINE**

In light of the substantial fraud penalty paid to the IRS, the United States does not recommend any fine be imposed.

**VI**

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 15 months, and order restitution of $1,380,628.98.

RANDY S. GROSSMAN
Acting United States Attorney

May 28, 2020

/s/ Valerie H. Chu
VALERIE H. CHU
Assistant U.S. Attorney