1   United States District Court

2   for the Southern District of California

3

4   UNITED STATES OF AMERICA,            )
                                         )
                                         )   No. 20cr1912
5        Plaintiff,                      )
                                         )   June 7, 2021
6            v.                          )
                                         )   San Diego, California
7   BRUCE BAKER,                         )
                                         )
8        Defendant.                      )
                                         )

9

10                  TRANSCRIPT OF SENTENCING
              BEFORE THE HONORABLE CYNTHIA BASHANT
11               United States District Judge

12  APPEARANCES:

13  For the Plaintiff:      UNITED STATES ATTORNEY'S OFFICE
                            VALERIE CHU
14                          MICHELLE WASSERMAN
                            Assistant United States Attorneys
15
    For the Defendant:      THOMAS J. WARWICK
16                          PATRICK Q. HALL
                            Attorneys at Law
17

18

19

20  Court Reporter:         Dana Peabody, RDR, CRR
                            District Court Clerk's Office
21                          333 West Broadway, Suite 420
                            San Diego, California 92101
22                          DanaPeabodyCSR@gmail.com

23

24

25

1        San Diego, California, June 7, 2021

2                    *   *   *

3        THE CLERK:  Calling Matter Number 4, 20cr1912, United

4   States of America versus Bruce Baker, on calendar for

5   sentencing with a presentence report.

6        MS. CHU:  Good morning, Your Honor.  Valerie Chu and

7   Michelle Wasserman for the United States.

8        MR. WARWICK:  Tom Warwick on behalf of Mr. Baker,

9   who's present before the Court on bond, and also Patrick Hayes,

10  another counsel that's been helping me out.

11       THE COURT:  Good morning.

12     Okay.  Mr. Baker, this is the date set for your sentencing.

13  I reviewed the probation officer's report, the government's

14  sentencing summary chart, the government's sentencing

15  memorandum and the appendix, your lawyer's sentencing

16  memorandum, your lawyer's sentencing summary chart, and then I

17  reviewed your letter as well as the letters from your cousin,

18  friends, and colleagues, thank you notes from patients, and

19  letters from your doctor as well.

20     I can tell you my tentative would be to follow the

21  government's recommendation in this case.

22     Mr. Warwick.

23       MR. WARWICK:  Your Honor, well, I'm -- Your Honor, my

24  client has been diagnosed with chronic lymphatic leukemia.

25  He's been given 10 to 15 years to live back in 2008.  It is now

1  2021.  He's 13 years into it.  His white blood cell continues
2  to be significantly problematic.  If he contracts a disease or
3  any type of infection, there is a strong probability that it
4  will be fatal.

5      Your Honor, it is -- they've exhausted their -- the medical
6  treatments in large respects.  In fact, one of the things that
7  I've spoken with the government about is the possibility of my
8  client going to Switzerland.  They have some experimental stem
9  cell procedures up there that might prolong his life.

10      Your Honor, I would hope that the Court would consider the
11 fact that being put in custody with the numerous people who
12 potentially could bear infections, that could cost him -- my
13 client's life is of dramatic consequence.

14      I would also point out to the Court that the presentence
15 report prepared by the probation department is recommending a
16 house arrest.

17      Your Honor, with regard to the offense, it is clear that my
18 client committed the offense.  It is clear that my client when
19 he became aware that there was an investigation -- nobody
20 contacted him.  In fact, he'd heard this information, and he
21 immediately filed a 1040X, which is an amended tax return for
22 all of the years, and basically told the government here's all
23 the money I owe.  And he sold his medical practice, his dental
24 practice, to provide the monies to pay all of the taxes and the
25 interest that were reflected in the 1040Xs.  The additional

1    amount of money that he owes in this particular case is a 75

2    percent penalty that is put on fraud cases --

3            THE COURT:  Can we shut the door, please?  We're in

4    the middle of court proceedings in here.

5        Thank you.

6        I apologize.

7            MR. WARWICK:  No problem, Your Honor.

8        The 75 percent penalty is added on to the taxes and

9    interest, so he's paid, in effect, the taxes.  He's paid most

10   of the interest.  As the government has indicated, it's hard to

11   compute the exact interest.  The IRS has to do it for us, but

12   we're fairly close.  The remaining amounts of money that he

13   owes are largely, if not completely, the 75 percent penalty in

14   this particular case.

15       Your Honor, the government has submitted a 5K1 letter.  I

16   assume that the Court is aware of that.  Immediately upon --

17   contacting the government, provided complete and full

18   cooperation.  As the Court is well aware from the 5K1 letter,

19   that most of us would consider extraordinary in the sense of

20   his activities.

21       As a result of trying to make amends to the government, he

22   has sold his practice, his dental practice, and basically used

23   all of that money to pay for the restitution he owes in taxes

24   and interest and will continue to make the rest of the

25   restitution.

1    In addition, Your Honor, which I think is of great

2  significance in this particular case, is that in cooperating

3  with the government, he was able to provide information that

4  led to others that were involved in this particular activity.

5    Now, if we go back to the other activity, the original

6  activity, it is my understanding from reading the sentencing

7  document that the person who is the hub of this wheel is

8  receiving no custody -- a no-custody recommendation.

9    THE COURT:  He has not been sentenced yet.

10    MR. WARWICK:  I didn't mean to usurp your authority,

11  Your Honor.

12    But is receiving a no-custody recommendation from the

13  government.

14    Your Honor, the understanding is -- that I have of this

15  particular case is that my client was a -- if you will, a

16  member of this Chabad, which is a form of the Jewish religion,

17  and this particular, if you will, rabbi was a confidant, was a

18  person who basically he trusted, he went to when he had

19  problems, he was there to try to assist him in his problems,

20  and this scheme was not something that my client generated.

21  This scheme was generated by the rabbi, and my client was

22  introduced to it based upon some financial problems that my

23  client had, and the rabbi strongly suggested that he

24  participate and use this as a way to avoid taxes.  And my

25  client did that, and he is deeply sorry for that.

1    Your Honor, in looking at the discovery in this particular

2  case, and I realize you haven't had a chance to see all of it,

3  there was actually communications from the rabbi to my client

4  saying, "I've got a lot of extra cash.  Can you use it?"

5    Your Honor, this is a situation where somebody who is

6  trusted, somebody who is respected, somebody who has a strong

7  religious basis, and giving an indication, my client was born

8  in Iran and was a Jewish person in Iran, and, obviously, in

9  order to maintain that faith in that particular Muslim country,

10  was an unusual experience.  And fortunately for him, he was

11  able to get out of Iran and move to the United States legally

12  and do everything he could to get to a country where there were

13  freedoms, and he could practice his religion in full bloom, if

14  you will.

15    Your Honor, the fact that my client on his own

16  initiative -- I agree with the government that in the ether

17  there was information.  There was an investigation.  I don't

18  know that anybody else has filed what, in effect, were 2010

19  through 2017 1040Xs to amend all of their tax returns, and

20  after amending all of their tax returns, paying all the taxes

21  and paying all of the interest as computed by his accountant.

22    I recognize from the government there is some disparity in

23  the interest and make all of those particular payments.

24    I would look at this and look at the 3553(a) and indicate

25  to the Court that, I mean, this is a potential of being -- I

1   don't mean to be overly maudlin or dramatic, but this is a

2   life-threatening thing if he goes into custody.  He has a

3   disease that has robbed him of his ability to defend himself

4   from infections.  And if he goes into a custodial situation,

5   there is, unfortunately, a dramatic possibility that if he

6   contracts anything at all, that his body will not be able to

7   fight off the disease, and he will be, in effect, potentially

8   at risk of life.

9       I understand that the Court wants to punish conduct

10  that's -- appropriately.  I would give weight to the probation

11  department, which is -- has -- looks at a lot of these types of

12  situations, and their factors that they have looked at and say

13  that we think that a period of house arrest.

14      I mean, Your Honor, he's largely limited.  Because of his

15  disease, all he does, and what he's been doing since the sale

16  of his practice, is he has set up volunteer work with UCSD to

17  treat indigent or less fortunate juveniles, which he's a

18  pediatric dentist, in order to provide and give something back

19  to the community.

20      I look at this and say we could put him into a custodial

21  situation, and that custodial situation might kill him.  Or the

22  disease might kill him as a result of him being in that type of

23  situation because he has a very weird diet.  He has very

24  difficult challenges as to what he can eat and what he can't

25  eat.  He has to eat multiple times a day.  He has to take

1  various types of homeopathic types of substances in order to

2  try to prevent and keep his immune system at the maximum level.

3      None of that is going to happen in a custodial situation.

4  And I look at it from the standpoint of what he would be doing

5  if he is not in custody is basically he would be volunteering

6  to help underprivileged children with pediatric dentistry and

7  basically confined to his home.

8      At least at his home, the chances of him contracting

9  something are dramatically less than what it would be in a

10  custodial situation.

11      I understand the consequences of punishment, Your Honor,

12  but with the COVID and all of the other things that are going

13  on right now, I would strongly recommend to the Court that the

14  possibility of a disastrous result if he is placed in custody

15  is significant, and it is not something that based upon his

16  conduct and everything he's done to try to remediate his

17  behavior and all the assistance he's given to the government,

18  all the money he has paid back, all of the efforts he has made

19  to be a positive citizen in the sense of his volunteering as a

20  pediatric dentist, and also all of the, I guess, guilt that he

21  has suffered upon himself, Your Honor, in the period of time

22  that I have known him and been involved with him, this has been

23  incredibly devastating.

24      He, I think, suffers from depression, I think suffers from

25  the guilt of what he did, and he is trying to the best of his

1   ability to return to a positive citizen in this particular

2   community.

3       Unfortunately, Your Honor, I would not be making these

4   arguments in the event that he was not of an eggshell cranium

5   of a frail individual that putting him into a situation with --

6   not to demean the Bureau of Prisons, but an area that is not

7   known for its acute care of individuals who have what has been

8   indicated by the doctors as a terminal disease.

9       I apologize for having to make this argument, but my client

10  is -- even without incarceration moving towards the end stages,

11  based upon the doctors, of his life, and placing him in a

12  custodial situation where that potential is dramatically

13  increased I would suggest to the Court is not a necessary

14  result in this particular case when we can basically

15  incarcerate him at home, avoid the potential of shortening his

16  life even more so than what's been indicated by the doctors,

17  and I would hope that the Court would consider that as an

18  alternative which provides sufficient but not excessive

19  punishment for his conduct in this particular case.

20      And I apologize for going on, Your Honor, but I spent a lot

21  of time as a result of COVID in this particular case with my

22  client, and this has been devastating to him, it has been

23  devastating to his family, and we hope that the Court will

24  consider all of these factors in making a fair and appropriate

25  decision in this case, Your Honor.

1          THE COURT:  Okay.  Dr. Baker, is there anything you

2    would like to say before I decide the appropriate punishment?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  If you could come up to the microphone.

5    It's harder to hear with the mask.

6          THE DEFENDANT:  Your Honor, I'm truly sorry for what I

7    have done.  I take full responsibility.  No one forced me to

8    break the law.  It was a decision I took based on arrogance and

9    stupidity.

10         Today I'm standing here in your court, court of law,

11   shameful and sorry.  If I could turn back the time, I can tell

12   you with certainty that I wouldn't be here today shameful and

13   broken.

14         I have done my best to repay and try to fix all the things

15   that I have wrong.

16         Thank you.  I appreciate it, Your Honor.

17         THE COURT:  Thank you.

18   Ms. Chu.

19         MS. CHU:  Thank you, Your Honor.

20         Your Honor, unfortunately, if we had to turn back time, it

21   would be turning it back 25 years because this was a

22   decades-long scheme.  Year after year, this man chose to cheat

23   on his taxes rather than paying what was appropriate, what was

24   necessary for the amount of income he had.

25         Your Honor, a minimal punishment here would support the

1  notion that if you just get by long enough, get away with it

2  long enough, then at some point, you will be old and infirm

3  enough to arguing that some minimal punishment is all that's

4  right, required, or necessary.

5      Your Honor, this man apparently enjoyed presenting a dual

6  face to society, and these letters, I understand, are

7  heartfelt, are sincere, paint a picture of someone who is

8  honorable, a role model, an inspiration, but he did so by

9  cheating while they had to pay their taxes, his employees, all

10 the people around him.  He didn't.  And he enjoyed the benefit

11 of his tax scheme year after year after year.

12     Your Honor, we have recognized that he has a medical

13 condition.  He's been living with that condition for sometime,

14 reportedly.  We noted at Exhibit E that there is no prognosis,

15 but that he is immunocompromised, and we have recognized that

16 with a variance for the medical condition.  We have recognized

17 the 5K departure and recommended that as well.

18     Your Honor, I think it is also commendable that he sold his

19 practice and has made a lot of efforts toward paying the

20 restitution.

21     I would also note on the other side that he still has,

22 according to the PSR, 25 real properties listed at Paragraph 80

23 of the PSR.  Whether some of those may have been sold by now,

24 it still reflects someone who has enjoyed a standard of wealth

25 and riches over the course of his life; that he has chosen,

1   however, to cheat again, year after year after year.

2      I would also not dispute that he did not generate this

3   scheme, but he really profited handsomely from it.  Of all the

4   co-conspirators that will appear in front of you, as far as

5   financial profit, there is no one like Dr. Baker.  $2.6 million

6   that he attempted to contribute and got back about $2.4 million

7   resulting in tax losses of over $644,000.

8      Your Honor, this is a difficult case.  We recognize that.

9   We recognize the circumstances and the equities that this

10   defendant presents, but we believe that it's important to apply

11   the sentencing factors which take into account the need for the

12   sentence, need for just punishment, the need for deterrence,

13   the need to recognize the seriousness of this crime, the one

14   that he chose to commit year after year at a cost to the

15   taxpayers, at a cost to those who would otherwise be trying to

16   comply with the law and pay what they are required to pay.

17      Your Honor, it does not give us any joy to recommend the

18   recommendation that we're making, but we feel it's an

19   appropriate and reasonable sentence in light of all the

20   circumstances here.

21      Thank you, Your Honor.

22        MR. WARWICK:  Your Honor, if --

23        THE COURT:  Let me see if there's anyone from

24   probation on the line.

25        PROBATION:  Yes, good morning, Your Honor.  Michael

1    Kent with U.S. Probation.  I stand by the PSR I submitted and

2    don't have any other comments to add.

3         Thank you.

4              THE COURT:  Okay.  Thank you.

5         Mr. Warwick.

6              MR. WARWICK:  Excuse me for interrupting, Your Honor.

7         With regard to the properties, Your Honor, there are only

8    two properties, the first and the third listed in the PSR.  All

9    of the other ones were in the past that have been sold and no

10   longer owned.  Apparently the database that they go, anything

11   that you've ever owned in your entire life as opposed to

12   current ownership.

13        So Item Number 1, which is the Pearl Street, and Item

14   Number 2, which is the Lindy Street -- Lindy Lane are the only

15   two that he has an economic interest in, so just to correct

16   that.

17        Your Honor, I don't want your job.  I mean, we're sitting

18   here, and if we file -- follow probation, and my client is

19   allowed to be under house arrest and hopefully live out his

20   days, which, based upon the medical indications, are limited,

21   he's getting towards the end of that term, that would obviously

22   be a reasonable decision.

23        On the other side, if the Court puts him in a custodial

24   situation, and that causes him to suffer a termination of his

25   life, I think all of us in this room would agree that that's

1  clearly excessive based upon this particular crime.

2  Your Honor, I implore the Court. Hopefully the Court will

3  place him in a -- in effect, a restricted situation at his home

4  for as long as the Court feels is appropriate where he can be

5  with his family and hopefully maintain his treatments and

6  prolong his life as long as he can.

7  I recognize both sides of the equation, but I would ask the

8  Court to consider leniency given the dramatic potential

9  consequences of a custodial sentence.

10  THE COURT: Okay. Dr. Baker, you begin with a base

11  offense level of 20. That calculates the intended loss, which

12  I think was stipulated to, of $644,000.82. I do find that

13  should be increased two points for sophisticated means. I find

14  it should be decreased three points for acceptance of

15  responsibility. You have no criminal record, so your guideline

16  range is 30 to 37 months. The government is recommending minus

17  three for 5K. I find that's appropriate. And that brings your

18  guideline range down to 21 to 27 months.

19  I think both sides have pretty much articulated both sides

20  of the coin in this case. I mean, I have to take into

21  consideration the fact that you're intelligent, you're well

22  educated, you understood the risks of what you were doing, and

23  the fact that this took place over such a long period, I tend

24  to agree with the prosecutor in this case, that it sort of

25  suggests that if you get away with a crime long enough that

1    eventually you get to a point in your life where you can argue

2    that you don't deserve any custodial time because you're infirm

3    enough that it could be a death sentence.

4        On the other hand, I am sympathetic with the fact that you

5    have this terminal disease, and, you know, there's this

6    potential that it could be the way you end your life, and I

7    certainly don't want that to happen, but on the other hand, I

8    do have to take into consideration not just specific

9    deterrence, but general deterrence.  I think it's very

10   important to send a message to the community that if you do

11   something like this, you will spend time in custody.  I really

12   do.

13       And I think what you did in this particular case, because

14   it went for such a long period of time, is particularly

15   heinous.  And I think the government's recommendation takes

16   both sides of the coin into consideration.

17       I really think that's the appropriate sentence considering

18   all the 3553(a) factors, so I will sentence you to 15 months in

19   custody.  I will follow that up with three years of supervised

20   release.

21       First of all, I will order restitution in the amount of

22   $1,380,628.98.  I find -- I realize that a vast majority of

23   that has already been repaid, but I will order that amount of

24   restitution.  I will also order a fine of $50,000.

25           MR. WARWICK:  With regard to the fine, both the

1  government and the defense, I think, are recommending that

2  there not be a fine because he's paying a 75 percent penalty,

3  which results in over $500,000.

4      THE COURT:  I understand that, so I will not impose a

5  fine in this case, but I will order that any remaining

6  restitution be due forthwith and paid at a rate of 50 percent

7  of your income or $25 per quarter while you're in custody or

8  $1,000 a month once you're out of custody.

9      I will order that while you're on your supervised release,

10  report any vehicles that you own or operate, you completely

11  disclose all personal and business financial records, you

12  notify the collections unit at the U.S. Attorney's office of

13  any interest you have in property before transferring it, you

14  don't open any new checking accounts or lines of credit without

15  the permission of the probation department, and you keep the

16  Court and U.S. Attorney's office informed of any change in

17  residence until your restitution is paid in full.

18      I will also order that if the probation department has any

19  reasonable suspicion to believe that you're violating the law

20  or violating your supervised release, they can search you.

21      In light of the fact that you are paying such a high

22  penalty on the restitution, I will not impose a fine, but I

23  will impose a $100 special assessment.

24      Mr. Warwick, I don't know what the plea agreement says.  Is

25  there a waiver of appeal in the plea agreement?

1          MR. WARWICK:  There is, Your Honor.

2          THE COURT:  Is that correct, Dr. Baker?  Did you give

3    up your right to appeal as part of your plea agreement?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  Is there any opposition to a

6    self-surrender date?

7          MS. CHU:  No, Your Honor.  Thank you.

8          THE COURT:  Okay.  Let's do a self-surrender date.

9          THE CLERK:  Self-surrender by Wednesday, July 28th, to

10   either the U.S. Marshals or the designated facility, and a bond

11   exoneration hearing set for Monday, August 2nd, at 9:00 a.m.,

12   and that will be terminated upon the self-surrender.

13         THE COURT:  Okay.  Dr. Baker, by July 28th, at noon,

14   you need to self-surrender to the facility where you've been

15   designated.  If you think you're going to have difficulty

16   getting there by noon, you can go early.  If you're not there

17   by noon, I will issue a warrant for your arrest and forfeit any

18   bond that's been posted on your behalf for bail.

19         THE DEFENDANT:  Thank you.

20         THE COURT:  Okay.  Thank you.

21         MR. WARWICK:  Thank you, Your Honor.

22         MS. CHU:  Thank you, Your Honor.

23                      ---000---

24

25

1           C-E-R-T-I-F-I-C-A-T-I-O-N

2

3        I certify that the foregoing is a correct transcript from

4    the record of proceedings in the above-entitled matter.

5

6        Dated March 29, 2022, at San Diego, California.

7

8
                          /Dana Peabody/
9                         Dana Peabody,
                          Registered Diplomate Reporter
10                        Certified Realtime Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25